UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EMILIE MACHUGA o/b/o,
PATRICK MACHUGA (Deceased)
      Plaintiff,                      CIVIL ACTION NO. 06-13577-DT

vs.

                                          DISTRICT JUDGE DENISE PAGE HOOD

COMMISSIONER OF                MAGISTRATE JUDGE MONA K. MAJZOUB
SOCIAL SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

**I.    RECOMMENDATION**

This Court recommends that Defendant's Motion Remand be **GRANTED** (Docket # 11), that Plaintiff's Motion for Summary Judgment be **GRANTED IN PART AND DENIED IN PART**(Docket # 8), and that the case be **REMANDED** to the Commissioner for further proceedings consistent with this Report.

**II.    PROCEDURAL HISTORY**

Plaintiff Patrick Machuga applied for Social Security Disability Insurance Benefits ("DIB") on August 4, 2000, alleging that he had been disabled since June 1, 1999 due to left knee and lower back pain. (Tr. 55-57, 68-69). His claim was initially denied in October 2000. (Tr. 43-47). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 48). After a hearing, Plaintiff's claim was denied by ALJ Jerome Blum on September 25, 2001. (Tr. 128-34, 149-76). Plaintiff thereafter sought review of the ALJ's decision with the Appeals Council on October 2, 2001. (Tr. 136). The Appeals Council issued an order on April 24, 2002 remanding the case back to ALJ Blum for further proceedings. Specifically, ALJ Blum was instructed to: (1) further develop the record by obtaining updated medical records from Plaintiff's treating sources or other medical sources, including, if

necessary, a consultative orthopedic examination or evidence from a medical expert regarding the nature and severity of Plaintiff's impairments; (2) address and discuss the weight given to the opinion of Plaintiff's treating physician, Dr. Steven J. Cusick, as to Plaintiff's ability to perform work-related functions; (3) re-contact the impartial medical examiner, Dr. Mitchell, regarding his 2001 report and examination of Plaintiff, which was not included in the record; and (4) evaluate the credibility of Plaintiff's statements regarding his pain and other symptoms. (Tr. 141-43).

Mr. Machuga died of coronary artery disease approximately a year after the Appeals Council remanded the case back to ALJ Blum for rehearing and reconsideration.[1] (Tr. 147). Consequently, a second hearing never took place. ALJ Blum subsequently issued a new opinion on October 28, 2004, in which he again denied Plaintiff's request for benefits. (Tr. 14-20). On June 12, 2005 the Appeals Council denied Plaintiff's request for a review of ALJ Blum's 2004 opinion and the ALJ's decision is now the final decision of the Commissioner. (Tr. 4-13). Plaintiff appealed the denial of his claim to this Court and filed a Motion for Summary Judgment. (Docket # 8). Defendant thereafter filed a Motion to Remand. Plaintiff responded to Defendant's Motion to Remand and Defendant replied. (Docket ## 11, 12, 13). These motions are now before this Court.

### III. FACTUAL SUMMARY

Plaintiff began treatment with Dr. Steven J. Cusick in April 1995 after Plaintiff transferred from the General Motors plant in Tennessee to the Michigan plant. (Tr. 113). Plaintiff complained of discomfort and swelling in his left knee on which he had arthroscopic surgery the previous year. Plaintiff had generalized sensitivity over the medial compartment but no jointline tenderness or ligamentous instability. Plaintiff was also neurologically intact. He did exhibit limited flexion due to a

---

[1] Plaintiff's mother, Emilie Machuga, was substituted in as a party on February 26, 2004. (Tr. 148, 179-81).

large effusion. The effusion was removed and Plaintiff was given a Cortisone injection. Plaintiff was given Naprosyn to take intermittently. *Id.*

Plaintiff eventually returned to his usual work activities and his knee became progressively more painful and swollen. Dr. Cusick noted in July 1995 that Plaintiff had effusion and probable medial jointline tenderness and crepitation. Dr. Cusick injected Plaintiff's knee with Marcaine and Aristocort. Dr. Cusick also restricted Plaintiff to no kneeling, squatting, stooping, and from walking for more than 10 minutes every hour per an 8-hour workday. He also stated that these restrictions should be considered permanent given the nature of Plaintiff's disease and its probable progression. (Tr. 113).

In January 1996 Dr. Cusick noted that Plaintiff's condition remained the same and that his work restrictions were expiring. Plaintiff also began to complain of right knee pain. Upon examination, Plaintiff had some effusion in his left knee with medial jointline tenderness. Plaintiff was prescribed Naprosyn and his restrictions were extended for 12 months. (Tr. 112). X-rays obtained in March 1996 showed the presence of some loose bodies in Plaintiff's left knee with some mild degenerative changes. *Id.* In April 1996 Plaintiff underwent atrhroscopy of his left knee with a partial chondroplasty of the medial femoral condyle. Several loose bodies were also removed from the left knee. Dr. Cusick noted that Plaintiff was doing well by May 1996. His pain had decreased and he had a good range of motion. Plaintiff was returned to work with restrictions. Dr. Cusick stated that Plaintiff should have a job in which he could sit for 60-70% of the time and which involved: (1) no lifting, pushing, or pulling of more than 25 pounds; and (2) no climbing, squatting, or kneeling. Dr. Cusick indicated that these restrictions should be considered permanent. (Tr. 111). Plaintiff was still doing well in June 1996 with only a little, intermittent pain. He was also taking Vicodin on an intermittent basis. *Id.* In August 1996 Plaintiff slipped on some oil at work and twisted both of his knees. (Tr. 110). Plaintiff's left knee showed minimal effusion and some range of motion crepitation. His right knee showed no significant loss of

motion but some tenderness over the medial collateral ligament. An x-ray of Plaintiff's right knee revealed no significant degenerative changes. *Id.*

Plaintiff resumed treatment with Dr. Cusick on several occasions in 1997. In February 1997 Dr. Cusick reported that Plaintiff had some tenderness in his knee and distal femur. He prescribed physical therapy and imposed the same restrictions that had been placed in April 1996. (Tr. 108). Plaintiff continued to complain of right knee pain in May 1997. An MRI indicated a partial tear of the anterior cruciate ligament. Plaintiff was prescribed more physical therapy. *Id.*

The record indicates that Plaintiff did not pursue treatment with Dr. Cusick in 1998. In August 1999 Plaintiff reported to Dr. Cusick that he was having increasing problems with his left knee because his new job required a lot of walking. Upon examination, Plaintiff had some mild effusion and tenderness over the anterior medial aspect of his left knee joint. An x-ray showed some degenerative changes but was essentially the same as his previous x-ray. Plaintiff was excused from work for 1 ½ weeks after which his "usual" restrictions were imposed, including walking for no more than 30 minutes per 4 hours or 1 ½ hours per day. (Tr. 107). Plaintiff's work continued to involve a lot of walking and climbing and he reported persistent pain and swelling in his knee. In September 1999 Plaintiff was given another Marcaine and Aristocort injection in his left knee but it was not effective. Dr. Cusick recommended that Plaintiff be evaluated for another arthroscopic procedure. (Tr. 106-07). Plaintiff underwent another arthroscopy with a partial chondroplasty of the medial femoral condyle and with the removal of loose bodies in December 1999. Dr. Cusick reported that Plaintiff was doing okay several days after the surgery with a little pain and mild effusion. Physical therapy was resumed. (Tr. 106).

Dr. Cusick reported in January 2000 that Plaintiff was progressing somewhat with physical therapy but was limping. In March 2000 Plaintiff stated that he was still having pain and his knee felt as if it were "giving way." He also complained of lower back pain with muscle spasms. Physical therapy was continued. By April 2000 Plaintiff was feeling better but stated that he had persistent back pain,

which was exacerbated by a fall. More therapy was prescribed. (Tr. 105). Dr. Cusick noted in May 2000 that Plaintiff had persistent knee pain and had difficulty climbing stairs. Plaintiff's back pain had improved with physical therapy. Upon examination, Plaintiff exhibited a limited range of motion in his lumbar spine but was neurologically intact. X-rays showed no degenerative changes to Plaintiff's back. These same complaints were reported in June and August 2000. (Tr. 104).

On September 29, 2000 a state agency medical consultant reviewed Plaintiff's medical records and completed a Physical Residual Functional Capacity Assessment ("RFC"). (Tr. 88-95). The consultant determined that Plaintiff had the RFC to: (1) lift/carry 50 pounds occasionally and 25 pounds frequently; (2) stand/walk/sit for about 6 hours in an 8-hour workday; and (3) occasionally climb ramps and stairs, balance, stoop, and crouch. However, the consultant found that Plaintiff was limited in his ability to push/pull with his lower extremities and that he could not climb ladders, ropes, or scaffolds, kneel, or crawl. (Tr. 89-90). The consultant noted that his findings were significantly different than that of Dr. Cusick who limited Plaintiff to 30 minutes of walking every 4 hours and no more than 1 ½ hours of walking per workday. However, the consultant noted that Dr. Cusick had imposed these limitations pre-surgery. (Tr. 94). The consultant also believed that Plaintiff's allegations of pain were mostly credible. (Tr. 93).

In November 2000 Plaintiff reported to Dr. Cusick that his knee was still causing pain, especially if he stood for any length of time. He also stated that he had associated swelling, a "catching sensation", and "grinding". Plaintiff further stated that he had a little back pain but that pain medication provided some relief. He took his medication 1-2 times a day and performed home exercises. (Tr. 103).

In February 2001 Dr. Cusick reported that Plaintiff still had left knee pain and intermittent swelling for which he took narcotic medication. Dr. Cusick further stated that Plaintiff was unable to return to any work other than a strict sit-down type of job for 4 hours a day and that he considered Plaintiff to be totally disabled. (Tr. 103). Dr. Cusick stated on May 2, 2001 that Plaintiff was taking 1-2

Vicodin pills per day for pain and swelling and that he remained disabled. Dr. Cusick also noted that Plaintiff would likely need a future arthroscopic debridement and knee replacement surgery. *Id.* Dr. Cusick then reported on May 23, 2001 that Plaintiff had considerable pain and swelling in his knee but was managing well and was still taking 1-2 Vicodin pills per day. Dr. Cusick continued Plaintiff on disability for another 90 days. (Tr. 102).

On May 25, 2001 a letter was sent to Plaintiff indicating that he had been examined by Dr. D. Mitchell, an impartial medical examiner, on May 24, 2001 and that Dr. Mitchell had found Plaintiff unable to work. Attached to the letter is an authorization form to release Dr. Mitchell's May 24th examination report. However, the form was never executed. (Tr. 101).

On October 3, 2002 Dr. S. Lele, an orthopedic surgeon, reviewed Plaintiff's medical records and performed a consultative examination of Plaintiff. (Tr. 114-18). Plaintiff informed Dr. Lele that he could not stand on this left leg and that climbing stairs, turning, twisting, kneeling, squatting, and walking caused left leg pain. He stated that his left knee would occasionally give out and would sometimes "snap". Plaintiff also told Dr. Lele that he experienced a constant ache in his lower back with pain that occasionally radiated into his neck. (Tr. 114). Plaintiff indicated that his leg and knee pain disturbed his sleep and that he lived with his mother who performed all of the housework. Plaintiff took 2 pills of hydrocodone every day for his pain but denied any other symptomatology. (Tr. 115).

Upon examination, Dr. Lele observed that Plaintiff demonstrated no pain or difficulty getting up from the examination chair. He stood erect and had a normal gait. Plaintiff stood well on his tiptoes and heels and was able to squat. However, Plaintiff complained of left knee and lower back pain upon squatting. (Tr. 115). Plaintiff exhibited a full range of cervical spine forward flexion and slightly limited cervical spine lateral flexion, extension, and rotation. No muscle tenderness or spasms were noted. With this examination, Plaintiff complained of lower back pain but not of neck pain. *Id.* Plaintiff's lumbar spine forward flexion was limited by 30 degrees and produced complaints of lower back pain.

Plaintiff's range of lumbar spine extension and lateral flexion was normal and there was no evidence of muscle spasms or tenderness. *Id.* Straight leg raising was at 90 degrees, at which point Plaintiff complained of lower back pain. A straight leg raising test performed with Plaintiff sitting upright with his knees at right angles was at 90 degrees with no complaints of pain. A straight leg raising test was also at 90 degrees in reverse order with no complaints of pain. Plaintiff was able to fully arch his neck and back without pain. *Id.* He exhibited a slightly limited range of hip flexion but his range of hip abduction, adduction, external rotation, and internal rotation were normal. *Id.* An examination of Plaintiff's knees showed no effusion or deformity. His range of knee mobility was 180 degrees through 60 degrees bilaterally with no complaints of pain. An examination of Plaintiff's upper extremities was normal. (Tr. 116). Based upon Plaintiff's history, examination, and medical history, Dr. Lele concluded that Plaintiff's left knee and lumbar spine were functionally normal. He also stated that Plaintiff had no disabling conditions and was fit to return to some type of employment. (Tr. 116).

Dr. Lele also completed a form entitled "Medical Source Statement of Ability to Do Work-Related Activities (Physical)." (Tr. 119-122). Dr. Lele concluded that Plaintiff's impairments did not affect his ability to: (1) lift/carry; (2) stand/walk; (3) sit; (4) push/pull; or (5) reach, handle, finger, or feel. (Tr. 119-21). He also found that Plaintiff could frequently climb ramps, stairs, ladders, ropes, and scaffolds, balance, kneel, crouch, crawl, and stoop. (Tr. 120).

On December 31, 2002 Dr. Steven E. Newman, who was designated as a medical expert by ALJ Blum, reviewed Plaintiff's medical records at Defendant's request. (Tr. 124-27). Based upon his review, Dr. Newman concluded that Plaintiff's impairments did not meet or equal the requirements for any listed impairment. (Tr. 125).

## IV. HEARING TESTIMONY

### A. Plaintiff's Testimony

Plaintiff was almost 45 years old when he testified before ALJ Blum. (Tr. 154). He had received a GED and had completed one year of college. (Tr. 155). Plaintiff testified that he had three arthroscopic surgeries on his left knee and the most recent surgery was performed in December 1999. He stated that he was unable to stand for long periods of time and had to keep his left leg elevated to reduce the pain and swelling. Plaintiff also testified that he could not sleep a full 8 hours at night because of the pain. The lack of sleep made him agitated, irritable, and unable to concentrate. (Tr. 157, 164). During the day, Plaintiff would elevate his left leg about 3 to 5 feet in the air for a total of 8 hours. (Tr. 157). Plaintiff estimated that he could walk about 10 minutes without resting, stand for about 15 minutes, and sit for about an hour to a couple of hours before needing to elevate his left leg. (Tr. 158-59). Plaintiff testified that he had pain and swelling in his leg every day but that walking made it worse. (Tr. 159). To alleviate his pain, Plaintiff would sometimes put his leg in a whirlpool bath and take medication. (Tr. 160). The medication did not help a lot. He took 4 to 5 extra strength Vicodin a day although his doctor recommended only 3 or 4 pills. *Id.* Plaintiff stated that the Vicodin made him drowsy and constipated. He tried other medications but they were not effective. (Tr. 168). Plaintiff also testified that he had previously tried using hot pads, ice, and cortisone shots while he was in physical therapy for his left knee. (Tr. 161). He also performed home exercises which he had learned at physical therapy. (Tr. 161-62). When asked about his daily activities, Plaintiff told the ALJ that his mother and a neighbor performed the housework and the yard work. (Tr. 158, 162). He was also able to drive without difficulty. (Tr. 154).

### B. Vocational Expert's Testimony

Dr. Peter Potiu, a licensed psychologist and vocational consultant, testified as a vocational expert at the hearing. (Tr. 171-75). The ALJ asked Dr. Potiu whether any unskilled sedentary jobs with a 5

pound limitation and a sit/stand at-will option existed in the Detroit metropolitan area. Dr. Potiu testified that there were 2,500 Detroit jobs and 4,000 Michigan jobs classified as assembler, sorter, or visual inspector that met this criteria. (Tr. 172). Additionally, Dr. Potiu testified that there were 5,000 Detroit jobs and 9,000 Michigan unskilled, clerical jobs that essentially met this criteria. (Tr. 173). However, the clerical jobs required the work to be performed from a seated position but did allow an individual to stand up and move about his or her workstation for brief, intermittent breaks. (Tr. 172-73, 175). The individual was also required to remain attentive to his/her task. (Tr. 175). Dr. Potiu further indicated that the jobs he identified could accommodate an individual who was required to elevate his or her leg on a foot stool at the hassock level but not at chest level. (Tr. 174). He also noted that work would be precluded for an individual who could function for only 4 hours in an 8-hour workday. *Id.*

## V. LAW AND ANALYSIS

### A. Standard of Review

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's decisions. Judicial review of those decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). It is not the function of this court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the Court must examine the administrative record as a whole. *Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by

substantial evidence, it must be affirmed, even where substantial evidence also supports the opposite conclusion and the reviewing court would decide the matter differently. *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

### B. Framework of Social Security Disability Determination

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff had to show that:

(1) he was not presently engaged in substantial gainful employment; and

(2) he suffered from a severe impairment; and

(3) the impairment met or was medically equal to a "listed impairment;" or

(4) he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner would, at step five, consider his RFC, age, education and past work experience to determine if he could perform other work. If not, he would be deemed disabled. 20 C.F.R. § 404.1520(f). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391.

### C. ARGUMENTS

The parties agree that the ALJ's decision is not supported by substantial evidence in several aspects. The ALJ first failed to properly address the opinions of Plaintiff's treating physician, Dr. Cusick, and state his reasons for rejecting said opinions. Federal Regulations provide that a treating source's opinion regarding the nature and severity of a claimant's condition is entitled to controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d). However, an ALJ is not bound by a treating physician's opinion if that opinion is not supported by sufficient clinical findings or is otherwise inconsistent with other substantial evidence in

the record. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997). If an ALJ rejects a treating physician's opinion, she must "give good reasons" for doing so in her written opinion." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d 541; Social Security Ruling 96-2p, 1996 WL 374188 *1. As noted above, Dr. Cusick opined that Plaintiff was disabled and he set forth several specific limitations regarding Plaintiff's ability to work due primarily to Plaintiff's left knee impairment. Dr. Cusick's opinions are not discussed within the ALJ's 2004 written opinion or within the ALJ's 2001 written opinion, which was incorporated by reference.[2]

The ALJ also failed to properly analyze the credibility of Plaintiff's statements regarding his pain and other symptoms. Social Security regulations prescribe a two-step process for evaluating complaints of pain and other symptoms. The plaintiff must establish an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain rising from the condition, or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain. 20 C.F.R. § 404.1529(b) (1995); *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991) (citing *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986)). If a plaintiff establishes such an impairment, the ALJ then evaluates the intensity and persistence of the plaintiff's symptoms. 20 C.F.R. § 404.1529(c) (1995); *Jones*, 945 F.2d at 1369-70. In evaluating the intensity and persistence of subjective symptoms, the ALJ considers objective medical evidence and other information, such as what may precipitate or aggravate the plaintiff's symptoms, what medications, treatments, or other methods plaintiff uses to alleviate his symptoms, and how the

---

[2] Although not specifically raised by Plaintiff, Defendant also concedes that the ALJ erred by failing to re-contact Dr. Mitchell regarding his May 2001 report and examination of Plaintiff. *See* 20 C.F.R. § 404.1512(d), (e); 20 C.F.R. § 404.1528(f)(ii). A letter to Plaintiff indicates that Dr. Mitchell found Plaintiff unable to work based upon his examination of Plaintiff and that a report was generated in connection with that examination. However, the report was not incorporated into the record.

11

symptoms may affect the plaintiff's pattern of daily living. *Id.* Furthermore, SSR 96-7p, 1996 WL 374186, at * 2 mandates that an ALJ has a duty to articulate the basis for a credibility determination, by including specific reasons that are supported by evidence in the case record. The ALJ, citing generally to SSR 96-7p, found Plaintiff's subjective complaints to be exaggerated and not fully credible. However, the ALJ failed to provide any specific reasons or evidence to support his credibility finding.

The parties agree that substantial evidence does not support the ALJ's decision for the reasons stated above and that the case must be remanded pursuant to sentence four of 42 U.S.C. § 405(g). However, the parties do dispute the proper course of action upon remand. Plaintiff argues that the case should be remanded with an award of benefits. Defendant asserts that the proper remedy is to the remand the case for further proceedings.

A district court may enter a judgment reversing findings of the Commissioner and remand for a hearing under 42 U.S.C. § 405(g). "[W]hen there is not substantial evidence to support one of the ALJ's factual findings and his decision must therefore be reversed, the appropriate remedy is not to award benefits. The case can be remanded under sentence four of 42 U.S.C. § 405(g) for further consideration." *Faucher v. Sec'y of Health & Human Srvs.*, 17 F.3d 171, 175-76 (6th Cir. 1994). It is appropriate to remand for an award of benefits only when "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher*, 17 F.3d at 176; *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994). This entitlement is established if "the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking. *Faucher*, 17 F.3d 176, citing to *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

All "essential factual issues" have not been resolved in this case and therefore a remand to award benefits would be inappropriate. The ALJ must weigh Dr. Cusick's opinions regarding Plaintiff's

permanent disability and specific exertional limitations against the other medical evidence in the record, including the findings and conclusions of Dr. Lele and Dr. Newman. The ALJ must also obtain and make factual findings regarding Dr. Mitchell's opinions and provide specific reasons explaining why Plaintiff's statements of pain and other symptoms were found not to be fully credible. The ALJ must make these factual determinations in the first instance. The Court may only review the ALJ's determinations based upon the reasons articulated by the ALJ. *See Brainard*, 889 F.2d at 681. Moreover, this is not a case where the proof of disability is overwhelmingly strong. As such, the appropriate procedure upon remand is for the Commissioner to conduct further proceedings consistent with this Report.

Plaintiff also requests that this Court remand the case back to the Commissioner with instructions to assign a different ALJ. Plaintiff claims that ALJ Blum's bias against him is evident because ALJ Blum did not fully comply with the Appeals Council's remand order and because the ALJ has now previously denied benefits to Plaintiff on two occasions.

The Supreme Court has found that "[t]he right to a trial by an impartial decision maker is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). Further, "the decision maker must also avoid even the appearance of bias." *Barthelemy v. Barnhart*, 2004 WL 1873224, at * 4 (7th Cir. 2004). However, courts do not lightly conclude that a judicial bias claim has been established. *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1463 (D.C. Cir. 1995). Courts presume that an ALJ is unbiased. *Schweiker v. McClure*, 456 U.S. 188, 195-96 (1982). Such a presumption can be rebutted by showing that the ALJ "displayed deep-seated and unequivocal antagonism that would render fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 556 (1994). Furthermore, "the presumption [of impartiality] can be overcome only with convincing evidence that a risk of actual bias or prejudgment is present." *Collier v. Comm'r of Soc. Sec.*, 2004 WL 1922187, at * 5 (6th Cir. 2004) (citations omitted).

"Stated differently, any alleged prejudice on the part of the decisionmaker must be evident from the record and cannot be based on speculation or inference." *Id.*

Plaintiff has not pointed to any evidence that ALJ Blum is biased against him or that a fair judgment upon remand in this case would be impossible. He has also not cited to any case, and the Court has not found such a case, in which the failure to fully follow an Appeals Council's remand order in one instance or the decision to deny benefits a second time upon remand qualifies as bias entitling a plaintiff to a new ALJ. *See Cummins v. Barnhart*, 460 F.Supp.2d 1112, 1122 (D. Ariz. Nov. 8, 2006), citing *Alfano v. Bowen*, 1988 WL 23542 (E.D.N.Y. 1988). The Commissioner may decide upon remand that assignment to a new ALJ is appropriate based upon its own policies and procedures. Furthermore, Plaintiff may envoke the provisions of 20 C.F.R. 404.940 to request the withdrawl of ALJ Blum. However, the Court concludes that Plaintiff has shown no proof of bias or partiality by ALJ Blum that would warrant a mandatory re-assignment of this case to a new ALJ upon remand. *See Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996); *Muse v. Sullivan*, 925 F.2d 785 (5th Cir. 1991).

## VI.     **CONCLUSION**

Based upon the foregoing, the Court concludes that substantial evidence does not support the ALJ's non-disability determination. The Court recommends that Defendant's Motion for Remand be **GRANTED** (Docket # 11) and that Plaintiff's Motion for Summary Judgment be **GRANTED IN PART** and **DENIED IN PART** (Docket # 8).

The Court further recommends that this case be **REMANDED** back to the Commissioner for further proceedings. Specifically, the following issues must be resolved upon remand:

1.     A discussion of the weight, if any, given to Dr. Cusick's opinion that Plaintiff was disabled and that Plaintiff could only work subject to certain restrictions. Any subsequent opinion must contain specific reasons to support the rejection of Dr. Cusick's opinion regarding Plaintiff's disability

and the specific restrictions imposed by Dr. Cusick, in accordance with 20 C.F.R. § 404.1527(d) and SSR 96-2p.

2. Re-contact Dr. D. Mitchell regarding his May 24, 2001 examination report of Plaintiff and clarify his opinion that Plaintiff was unable to work. Any subsequent opinion must specifically address the weight, if any, given to Dr. Mitchell's opinion and should explain the basis for said decision with citation to the record evidence.

3. A discussion of Plaintiff's statements regarding his pain and other symptoms with specific reasons and citations to the record evidence, in accordance with 20 C.F.R. § 404.1529 and SSR 96-7p, explaining why such statements are not credible.

4. If necessary, the ALJ must also undertake a new step-five analysis after fully considering the impact, if any, of the opinions of Dr. Cusick and Dr. Mitchell and of Plaintiff's credible statements on his or her RFC finding.

Dated: June 7, 2007                s/ Mona K. Majzoub
                                   Mona K. Majzoub
                                   United States Magistrate Judge

## PROOF OF SERVICE

I hereby certify that a copy of this Opinion and Order was served upon Counsel of Record and the Clerk's Office on this date.

Dated: June 7, 2007                s/ Lisa C. Bartlett
                                   Courtroom Deputy